**Andrew PARKER, et al., Plaintiffs,**

v.

**TIME WARNER ENTERTAINMENT COMPANY, L.P., Defendant.**

No. 98–CV–4265.

United States District Court,
E.D. New York.

Jan. 25, 2007.

**320**

Michael G. Lenett, Cuneo Waldman & La-duca, LLP, Washington, DC, Peter Steven Linden, Pamela E. Kulsrud, Ira Michael Press, Kirby McInerney & Squire, LLP, New York, NY, for Plaintiff.

Jonathan D. Thier, Landis Cox Best, Cahill Gordon & Reindel, LLP, New York, NY, for Defendants.

George W. Sampson, Hagens Berman LLP, Seattle, WA.

Steven B. Witman, Law Office of Steven Witman, Metairie, LA.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

Plaintiffs Andrew Parker ("Parker") and Eric DeBrauwere ("DeBrauwere") (collectively, "Plaintiffs") bring this action individually and as representatives of a purported class, against Defendants Time Warner Entertainment Company, L.P. and Time Warner Cable, Inc. (collectively, "Time Warner" or "Defendants"). Plaintiffs allege in their amended complaint (the "Amended Complaint") that Defendants violated the subscriber privacy protections of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 et seq. (the "Cable Act"), by disclosing and selling personally identifiable information about their subscribers to third parties and by failing to provide subscribers with clear and conspicuous notice of its disclosure of such information.

This action, initiated over eight years ago, has raised and continues to raise complex and novel questions of law, including the interrelationship between class actions and statutory damage awards, the application of the Cable Act's notice provisions, and the propriety of the class action device itself when employed in aggregating millions upon millions of claims. Those considerations aren't addressed here, but set the backdrop for the pre-class certification "Proposed Settlement" for which the parties seek final approval. That motion obligates the Court to evaluate compliance with class certification and notice standards as well as the fairness of the settlement sought. For the following reasons, the Court must deny final approval.

### BACKGROUND

#### I. Prior Decisions

This case has already been the subject of several opinions. See 1999 WL 1132463 (E.D.N.Y. Nov. 8, 1999) (denying Defendants' motion to dismiss the Amended Complaint) (Korman, J.); 198 F.R.D. 374 (E.D.N.Y.2001) (adopting the report and recommendation of Magistrate Judge Azrack certifying a class for injunctive and declaratory relief but denying certification of a class for damages); 331 F.3d 13 (2d Cir.2003) (vacating the decision of this Court and remanding for further proceedings). Accordingly, this Memorandum and Order incorporates and assumes familiarity with the facts described in these decisions. Only the facts necessary to understand the parties' arguments in connection with this motion will be restated here.

#### II. The Amended Complaint

Plaintiffs filed the Amended Complaint in November, 1998, from which the following allegations are taken. Time Warner is the world's largest cable owner and operator with thirteen million subscribers nationwide, including one million in New York City alone. (Am.Compl. ¶ 38). At the filing of the Amended Complaint, both Parker and DeBrauwere were subscribers of Time Warner.[1] (Id. ¶¶ 13–14). Parker has subscribed to Time Warner since 1994 and has also purchased "Time Warner's premium programming on a 'pay-per-view' basis," while DeBrauwere has been a Time Warner sub-

---

1. Because both Parker and DeBrauwere were on a January 1999 list sales database ("LSDB"), the one used to measure participation in benefits, and are current subscribers, they are "Category I" plaintiffs, as defined infra, Background IV.B.

scriber since 1996, including in his subscription premium channels such as Home Box Office ("HBO"). (*Id.* ¶¶ 13–14, 39–40). The Amended Complaint seeks to certify a class under Fed.R.Civ.P. 23(b)(2) & (3).

The Amended Complaint alleges that Time Warner collected detailed personal information about and from subscribers throughout its nation-wide system. (Am.Compl. ¶¶ 4, 43). Time Warner maintained this information in a so-called list sales database ("LSDB"), which it offered for sale to third parties, including telemarketers, direct marketing services companies, and other Time Warner affiliates and divisions. (*Id.* ¶¶ 6, 9, 45–48, 60). The database included subscribers' names and addresses, private programming selections, such as the names of subscribers of premium channels, including HBO, Disney, and Playboy, credit card information, places of employment, whether subscribers lease or own their residence, and social security and drivers' license numbers.

(*Id.* ¶¶ 11, 43). Time Warner enhanced the database with personal subscriber information it had obtained from third parties, including Time Warner affiliates and divisions. (*Id.* ¶¶ 4, 7, 44, 68).

The Amended Complaint alleges that Time Warner violated the Cable Act's substantive privacy provisions by collecting and distributing personally identifiable information ("PII") about them, and also violated its notice provisions by failing to adequately inform them of its information practices.[2] It more precisely alleges that Time Warner, through one of its divisions, Time Warner Cable Direct, violated the disclosure provisions set forth in the Cable Act, 47 U.S.C. § 551(c),[3] by selling, failing to protect, or otherwise disclosing to third parties the detailed PII it collects regarding many of its subscribers without subscribers' knowledge or consent. (Am.Compl. ¶¶ 8, 55–60, 71–74).

Plaintiffs further contend that Time Warner violated Section 551(a)[4] of the Cable

2. The Amended Complaint also identified three state law causes of action based upon identical factual predicates: (1) violation of state law deceptive trade practice statutes, (2) negligent misrepresentation, and (3) unjust enrichment. (Am. Compl. ¶¶ 84–105).

3. Section 551(c) states, in relevant part:
(c) Disclosure of personally identifiable information
(1) Except as provided in paragraph (2), a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned and shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator.
(2) A cable operator may disclose such information if the disclosure is—
(A) necessary to render, or conduct a legitimate business activity related to, a cable service or other service provided by the cable operator to the subscriber;
(B) subject to subsection (h) of this section, made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed;
(C) a disclosure of the names and addresses of subscribers to any cable service or other service, if—
(i) the cable operator has provided the subscriber the opportunity to prohibit or limit such disclosure, and
(ii) the disclosure does not reveal, directly or indirectly, the—

(I) extent of any viewing or other use by the subscriber of a cable service or other service provided by the cable operator, or
(II) the nature of any transaction made by the subscriber over the cable system of the cable operator; or
(D) to a government entity as authorized under chapters 119, 121, or 206 of Title 18, except that such disclosure shall not include records revealing cable subscriber selection of video programming from a cable operator.

4. In pertinent part, section 551(a)(1) states:

(1) At the time of entering into an agreement to provide any cable service or other service to a subscriber and at least once a year thereafter, a cable operator shall provide notice in the form of a separate, written statement to such subscriber which clearly and conspicuously informs the subscriber of—
(A) the nature of personally identifiable information collected or to be collected with respect to the subscriber and the nature of the use of such information;
(B) the nature, frequency, and purpose of any disclosure which may be made of such information, including an identification of the types of persons to whom the disclosure may be made;
(C) the period during which such information will be maintained by the cable operator;
(D) the times and place at which the subscriber may have access to such information in accordance with subsection (d) of this section; and
(E) the limitations provided by this section with respect to the collection and disclosure of

Act—the notice provisions—because it failed to adequately notify Time Warner's cable subscribers of Time Warner's actual use and disclosure of their PII, including but not limited to, the nature of all PII collected and the nature of all uses of such information, the frequency and purpose of the disclosures, and the period during which Time Warner would maintain it. (Am.Compl. ¶¶ 62–71, 80).

47 U.S.C. § 551(c)(2)(C) permits a Cable Provider to disclose information to other cable services or another service provided that the subscriber is given notice of the practice and the right to prohibit or limit the disclosure.[5] Therefore, the allegations under 551(a) & 551(c) are fundamentally based not upon the disclosure of PII, but on the failure to properly notify the class of those disclosures or provide for the right to opt-out.

As redress for the alleged violations of Sections 551(a) & 551(c) of the Cable Act, Plaintiffs seek "at a minimum, hundreds of millions of dollars" for their actual damages and statutorily mandated individual damages, and injunctive relief to restrain Defendants from further Cable Act violations. (Am. Compl. ¶¶ 72–83).

## III. Procedural History

Before the parties engaged in any discovery, Time Warner filed a motion to dismiss the Amended Complaint pursuant to Fed. R.Civ.P. 12(b)(6). In an amended Memorandum and Order entered on November 8, 1999, Chief Judge Korman, reversing his prior ruling issued from the bench, denied Defendants' motion, and held that the following allegations in the Amended Complaint stated a claim for relief under the Cable Act: (i) Time Warner failed adequately to notify subscribers that it was selling information gathered from third party sources along with information it collected directly from subscribers; and (ii) Time Warner improperly disclosed subscribers' programming selections without first providing a valid opt-out. 1999 WL 1132463, at *11.

Defendants then moved to deny class certification. Magistrate Judge Azrack of this Court subsequently issued a Report and Recommendation that class certification under Rule 23(b)(3) be denied and that certification under Rule 23(b)(2) be limited to Plaintiffs' declaratory and injunctive claims under the Cable Act. (Docket Entry Number 74, entered October 5, 2000). This Court adopted Judge Azrack's recommendations in a Memorandum and Order entered on January 10, 2001, though for slightly different reasons. *See* 198 F.R.D. at 374, 382. Like Magistrate Judge Azrack, this Court presumed that Plaintiffs could satisfy the requirements of Fed.R.Civ.P. 23(a), but concluded that certification of Plaintiffs' damages claim under Fed.R.Civ.P. 23(b)(3) should be denied as a matter of law because Plaintiffs' request for monetary relief predominated. 198 F.R.D. at 381–86. Utilizing the analysis set forth in the Fifth Circuit's decision in *Allison v. Citgo*, 151 F.3d 402 (5th Cir.1998), then the leading case decided on the predominance requirement of Rule 23(b)(2), this Court exercised its discretion in finding that the "statutory damages claim" was but "one aspect of Plaintiffs' request for monetary relief," and thus ruled that "it cannot be said that the entirety of Plaintiffs' damages claim is 'incidental' to their request for injunctive relief." 198 F.R.D. at 380–81 (citation omitted).

Moreover, in denying certification of a damages class under Fed.R.Civ.P. 23(b)(3), this Court focused on the superiority of class litigation, the technical nature of the alleged violations of the Cable Act and the impact of

information by a cable operator and the right of the subscriber under subsections (f) and (h) of this section to enforce such limitations.
In the case of subscribers who have entered into such an agreement before the effective date of this section, such notice shall be provided within 180 days of such date and at least once a year thereafter.

**5.** Section 551(c)(2)(C) states in relevant part:
(C) a disclosure of the names and addresses of subscribers to any cable service or other service, if—

(i) the cable operator has provided the subscriber the opportunity to prohibit or limit such disclosure, and
(ii) the disclosure does not reveal, directly or indirectly, the—
(I) extent of any viewing or other use by the subscriber of a cable service or other service provided by the cable operator, or
(II) the nature of any transaction made by the subscriber over the cable system of the cable operator;

a potentially large class upon defendants. This Court held that a class action was not the superior method for addressing a violation of the Cable Act because it would constitute a "misuse of the procedural mechanism ... to turn what is fundamentally a consumer protection scheme for cable subscribers into a vehicle for the financial demise of a cable service provider that failed to comply with technical aspects of that scheme." *Id.* at 384.

In so doing, this Court followed the holding of *Wilson v. American Cablevision of Kansas City,* 133 F.R.D. 573 (W.D.Mo.1990), the only other court to have considered whether to certify a 23(b)(3) class action under the Cable Act. The court in *Wilson* denied 23(b)(3) certification for a class complaining of 551(f) violations because the complaints were merely technical and involved no actual harm to plaintiffs. That court analogized the case to Truth–in–Lending–Act ("TILA") class actions in which certification had been denied because of the disproportionate damages authorized by the statute for harms not based upon actual damages. *See, e.g., Watkins v. Simmons and Clark, Inc.,* 618 F.2d 398 (6th Cir.1980) (denying 23(b)(3) certification of a TILA class action). In effect, it was those provisions for statutory damages which made individual suits viable and therefore superior to class actions that justified denial under the "predominance" standard for 23(b)(3) classes. Additionally, this Court found that other 23(b)(3) factors weighed in favor of denying certification. *Parker,* 198 F.R.D. at 384–85.

Following an interlocutory appeal to challenge this Court's decision to only certify a class under Rule 23(b)(2) limited to injunctive and declaratory relief (and not damages under Rule 23(b)(3)), the Second Circuit vacated this Court's ruling and remanded the case for additional proceedings. *Parker,* 331 F.3d at 13. The Second Circuit noted that it had decided *Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002) shortly after this Court's decision. *Robinson* held that district courts must consider detailed evidence when deciding whether to certify a Rule 23(b)(2) class. 331 F.3d at 20–21. The Second Circuit observed that

although this Court had held that Plaintiffs' request for injunctive relief appeared an insignificant aspect of the case, and a mere "cover" for the monetary claims, there was no way to know how this Court would have ruled if it had applied the *Robinson* approach, consistent with the "factual information necessary to decide whether or not to certify a Rule 23(b)(2) class." *Id.* at 21. The remand obligated this Court to reconsider Plaintiffs' request for class certification only after the parties had engaged in discovery to determine whether, as a matter of fact, 23(b)(2) requirements were satisfied. *Id.*

The Second Circuit also held that this Court must revisit its refusal to certify a class under Rule 23(b)(3) because it lacked sufficient information to determine if certification of a class would raise, amongst other things, issues of due process on account of the size of the class and its largely technical and statutory damage claims. 331 F.3d at 21–22. The Second Circuit acknowledged the legitimacy of manageability concerns as well as the potential for a damages award that could lead to Time Warner's financial demise. However, it found such a determination premature, since the record did not contain any evidence of how large the proposed class would be. *Id.* at 22. Specifically, the Court commented that "Parker has given no indication that he would actually seek to certify a class of *all* twelve million subscribers" and thus "[u]nder the circumstances, the Court's conclusion that the size of the class would inevitably lead to 'the financial demise' of Time Warner, or even to significant manageability provisions, was speculative." *Id.* at 22 (emphasis in original).

## IV. Discovery

Following remand the parties engaged in class certification discovery. Time Warner produced privacy notices from 1994 through 1998 from relevant divisions, extensive documentation relating to Time Warner Cable Direct's list sales business including the list sales orders, and four of its employees or agents for deposition—John Collins, Gary Olmsted, Crystal Williams and Larry Zipin. Plaintiffs also took the depositions of two former Time Warner employees, Terrance

Harter and Lauren Burakoff, as well as the deposition of a corporate representative of Adrea Rubin Management, Inc. ("Adrea"), a third-party broker through which Time Warner sold its sales lists. Through a third-party subpoena, Plaintiffs also received documents from Adrea. Finally, Defendants took the depositions of Parker and DeBrauwere, the putative class representatives.

The discovery process shed some light on Time Warner's lists sales business, but also left many questions unanswered. With respect to former and current Time Warner employees who were deposed, there was an apparent conflict in the record as to whether the LSDB existed in such a form as to allow identification of the individual Time Warner subscribers whose personal information was sold or otherwise shared with third parties. According to Terrence Harter ("Harter"), Time Warner's former Director of Direct Response Advertising from February 1994 through February 1997, the Company maintained a "flagging" system in software that attached to the subscriber personal information records which would reveal that a particular subscriber's information was included on an ordered list. (Harter Aff. ¶¶ 13–14). However, when pressed at his deposition, Mr. Harter conceded that he had no technical knowledge about the list sales database, and had no access to the records in the database. (Harter Dep. at 53, 148, attached to the Declaration of Landis Best, "Best Decl.," as Exh. M).

In contrast, Gary Olmsted ("Olmsted"), a former manager of Time Warner's information systems and technology department, testified that there was no "flagging" system, and due to the constantly evolving nature of the list sales database, it would be impossible for the Company to recreate whole lists that

were previously sold by Time Warner. (Olmsted Dep. at 191–195, attached to the Best Decl. as Exh. G; Olmsted Aff. ¶¶ 12, 16–20).

Despite the difficulties involved in recreating sales records from the list sales database itself, it was discovered that a list of some 4.5 million individuals, not culled of duplicates, could be collated from the receipts of the list sales orders, and that those lists could identify what categories of information were sold. (*See* "Order Settling Various Discovery Disputes", 12–23–2003, Azrack, M.J., Docket No. 96). Magistrate Azrack found that information sufficient for the purposes of seeking class certification to deny Plaintiffs' requests for access to the list sales database and other similar materials. (*Id.*).

Discovery did not yield precise numbers of subscribers whose information was either sold or subject to sale, and not all estimates pertained to the same period of time, or contemplated the various distinctions between class members introduced through this litigation by virtue of the settlement. The numbers, however, do approach a consensus estimate. For the purposes of this discussion it can be said that the number of class members exceeds 10 million, and that the number of individuals entitled to individualized benefits from the Proposed Settlement is between 1.37 to 4.7 million, depending on how many of them still live in an area serviced by Time Warner.[6] (*See* May 5, 2006 Letter to Mr. Anderson, Attorney for the Loburs by Jonathan Thier, Attorney for Time Warner, ("Anderson Ltr.") Docket No. 165).[7] Out of those who appeared on the January 1999 LSDB, roughly 1.37 million of them are current subscribers. (*Id.*). There-

---

**6.** Gary Olmsted, a manager in the IT department of Time Warner's corporate offices, avers that by 1998 there were approximately 4.9 million subscriber names in the database, drawn from approximately 12 million Timer Warner subscribers nationwide. (Olmsted Aff., ¶ 3 attached as Ex. C to the Affidavit of Landis C. Best in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification).

**7.** This letter, addressed to the attorneys of several objectors, was submitted by Time Warner's attorney in support of Time Warner's opposition to further discovery by the objectors. There, he

summarized Time Warner's understanding of the class numbers in terms of the objectors proposed categories. That letter indicates that the number of "Category I" class members is approximately 1.37 million, the number of "Category II & III" members combined to be approximately 3.4 million, and the number of Category IV members to be in excess of 10 million. (*Id.*). Time Warner's attorney states that "It is not possible for us to accurately distinguish between your Category II ... and Category III ... because we do not have current addresses for these individuals, and thus simply do not know whether they now live in an area serviced by Time Warner Cable." (*Id.*).

fore, the remainder of them, some 3.4 million individuals, are former subscribers. (*Id.*).

These figures coincide with those asserted by Plaintiffs in their original motion for class certification which has since been withdrawn. That motion indicated that, for the relevant time period, there were 14.4 million cable subscribers.[8] (Pls. Mot. Class Cert. 20). Of that number, about 3.6 million names appeared on the January 1999 LSDB, the only database that the parties have relied upon in determining class size. (*Id.*). The number of class members who were subscribers during the class period but not on the January 1999 LSDB is roughly 10.8 million. (Pls. Mot. Class Cert. 20).

Finally, evidence produced during discovery revealed that Time Warner has not participated in the corporate list sales business for at least five years. (Olmsted Dep. at 84–84; Collins Dep. at 87–88, attached to the Landis Best Decl. as Exh. H). During the time that its list sales business was operational, it generated approximately $316,000 in gross revenue. (Collins Dep. at 90). In the summer of 1999, Time Warner revised its privacy notice. 198 F.R.D. at 376. Plaintiffs have not challenged the legal sufficiency of the revised privacy notice.

## V. Plaintiffs' Motion for Class Certification and Proposed Settlement

After discovery, Plaintiffs moved to certify a class composed of all Time Warner cable subscribers between 1994 and 1998, inclusive. In June, 2005, prior to argument being heard on the class certification motion, the parties agreed to the Proposed Settlement and, pursuant to Fed.R.Civ.P. 23(e), this Court entered an Order dated October 21, 2005, granting preliminary approval of that Settlement. *Notice Order,* Docket No. 116. In that Order, the Court scheduled a hearing ("Fairness Hearing"), which was held on May 19, 2006. Included in the preliminary approval was a plan for noticing the class ("Notice Plan"), detailed below.[9] The October 21 Order resulted in a termination of the motion to certify the class.

Prior to the Fairness Hearing this case's docket was inundated with activity. Numerous letters objecting to the settlement were received. Motions seeking leave to intervene and to conduct limited discovery were filed by Sharon Lobur and Rick Lobur (collectively, "Loburs" or "Objectors"), members of the putative class.[10] Those motions were opposed by Plaintiffs' counsel, while Time Warner took no position with respect to them. The Loburs also filed extensive objections to the Proposed Settlement, the details of which are discussed below. A motion objecting to the allocation of attorney's fees and the fairness of the settlement and an "application for intervention" was filed by Steven B. Witman, attorney for Lydia Townsend and Rosalie Vitrano, other putative class members. Plaintiffs and Time Warner filed a joint motion for final approval of the settlement, and Plaintiffs submitted motions for attorneys' fees accompanied by pertinent affidavits. Finally, on May 19, 2006, the parties, objectors, and proposed intervener participated in the Fairness Hearing on the Proposed Settlement.

## VI. The Proposed Settlement Agreement

### A. Class Benefits

As part of the Proposed Settlement, the parties stipulate that the class will be certified under Fed.R.Civ.P. 23(b)(2) and (b)(3). ("Stipulation and Agreement of Settlement" ("Stlmt."), attached to the Declaration of Daniel Hume as Ex. A, ¶ 2). Plaintiffs' briefing of the class certification question, particularly as to whether or not they wish to certify both an injunctive and damages class under 23(b)(2), as the Second Circuit held was theoretically possible under *Robinson,* or merely a 23(b)(2) injunction only class combined with a 23(b)(3) class as described in the "Plaintiffs' Memorandum of Law in Support of Motion for Class Certification," ("Pls. Mot. Class Cert.") is decidedly ambiguous. It appears that they seek 23(b)(2) certification for both injunctive relief and damages, and in the

---

**8.** That number is arrived at by adding the 23(b)(2) and 23(b)(3) class estimates together.

**9.** At that time, no objection to the notice plan had yet been raised.

**10.** The Loburs moved to intervene "on behalf of themselves and all other similarly situated, which includes Category II and IV Class Members." (Lobur Mot. Intervene, ¶ 4).

alternative, 23(b)(3) certification for a damages class. (Jt. Mem. in Support of Stlmt., 35–37). The class is defined as "all persons throughout the United States who were Time Warner Cable subscribers at any point in time between January 1, 1994 and December 31, 1998, except for Time Warner Cable employees, officers, directors and counsel." (Stlmt. ¶ 2).

### 1. In-kind relief

Class members eligible for benefits are those whose names are on "the last Time Warner Cable [LSDB] (dated on or about January 3, 1999)." (Stlmt. ¶ 2).[11] Those class members on that LSDB [12] and currently subscribing to Time Warner Cable are eligible for either a free additional service or two free movies on demand. (Id. ¶ 3). Class members on the list but who are not current subscribers and who currently live in an area serviced by Time Warner are eligible to receive one month of free services with no installation fee. (Id.). Former subscribers who live in an area not currently serviced by Time Warner do not receive a direct benefit, but are given the right, within 120 days from the end of the opt-out period, to freely transfer one of the above benefits to a person living in an area serviced by Time Warner. (Id. ¶ 5). If "fewer than 7% of the total number of List Class Member Current and Former Subscribers" have failed to apply for benefits, as counted by the claims administrator 120 days from the end of the opt-out period, "then claimants and transferees shall receive double their chosen benefit." (Stlmt. ¶ 7). Class members not on the January 1999 LSDB are not entitled to anything.

Although the parties contend that benefits are provided differently to only two groups, "list class member current subscribers" and "list class member former subscribers" (Id. ¶ 2), the details of the Proposed Settlement make clear that there are, as the Lobur Intervener claim, at least four discrete groups within the proposed class who will receive different benefits under the settlement. The Loburs' terminology for those categories of plaintiffs, which this Court adopts, is a follows:

(1) those Class Members who are listed on the Time Warner List Sales Database dated January 1, 1999, ("LSDB"), and who currently subscribe to Time Warner Cable services, which are defined as "List Class Member Current Subscribers" (hereinafter "Category I" Class Members); (2) those Class Members who are listed on the LSDB and who no longer subscribe to Time Warner Cable services, but live in an area served by Time Warner Cable (hereinafter "Category II" Class Members); (3) those Class Members who are listed on the LSDB and who no longer subscribe to Time Warner Cable services, and who do not live in an area served by Time Warner Cable (hereinafter "Category III" Class Members); and, (4) those Class Members who are not listed on the LSDB (hereinafter "Category IV" Class Members). . . .

(Lobur Obj. at 3–4, n. 1).

### 2. Notice Provisions

The Settlement also provided for the same Notice Plan given preliminary approval by this Court. At the time of preliminary approval, the parties did not specify the type of class they intended to certify, and the objections discussed here had yet to be raised. The Notice Plan was to be paid for by Time Warner. (Stlmt. ¶ 19). In essence, it provided for individual notice to be mailed to all current subscribers who were on the 1999 LSDB, a website dedicated to publishing the Proposed Settlement and processing claims,

---

**11.** Paragraph Two of the Proposed Settlement describes how class member status will be determined:

Within 30 days after the Court grants Preliminary Approval, Time Warner will provide to plaintiffs the results of a computer match which shall determine the approximate numbers of class members whose names were contained in the . . . [LSDB], and whether said class members are current or former Time Warner Cable subscribers . . . Plaintiffs may conduct confirmatory discovery to determine

that the methodology and number of subscribers that results from the computer match are as accurate as is reasonably practicable. (Stlmt. ¶ 2).

**12.** The January 1999 LSDB was the sole basis for determining benefits for class members. Although there were other LSDBs, for simplicity's sake when discussed in this opinion, a reference to "the LSDB" refers specifically to January 1999 LSDB.

and a publication notice program that was extensively defined in the Affidavit of Wayne L. Pines [13] ("Pines Aff.," Ex. 3, attached to the "Declaration of Daniel Hume in Support of Motion for Preliminary Approval of Class Action Settlement"). Pines avers that the direct mail notice portion of the plan alone would reach approximately 1.5 million members. (Pines Aff. ¶ 8).

In addition to the Pines Affidavit, Plaintiffs also submitted the Affidavit of Jennifer M. Keough Regarding Notice and Claims Administration ("Keough Aff."). Keough, a senior vice president of GCG, averred that the Notice List contained 1,374,934 addresses. (Keough Aff. ¶ 3). Prior to sending out the information, the list was updated through the "National Change of Address database," which "makes change of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mailstream." (Keough Aff. ¶ 3, n. 1). However, since "the address information is maintained on the database for three years and is then purged," it is only a cost effective tool "to update addresses for up to a three-year period." (*Id.*). The remainder of the class was to be noticed by publication, primarily through a collection of magazines identified in the Affidavit. (*See* Pines Aff. ¶ 10).[14]

### 3. Injunctive, remedial, and cy pres relief

The Proposed Settlement includes a section entitled "Injunctive and Remedial Relief." Time Warner notes that it has already revised its video programming notice, in part because of this litigation, but nevertheless agrees to further revise that notice as provided at Exhibit 4, as well as any notice it later gives should it again engage in the list sales business. (Stlmt. ¶ 14). In addition, the Proposed Settlement provides that Time Warner will appoint a Chief Privacy Officer to ensure compliance with the privacy provisions of the Cable Act. (Stlmt. ¶ 16), and calls for cy pres relief in the form of $250,000 payments to both the Samuelson Law, Technology and Public Policy Clinic at Boalt Hall Law School and the Center for Democracy and Technology's Ronald Plesser Fellowship. (Stlmt. ¶ 17). Finally, the named plaintiffs, Parker and DeBrauwere, are to receive $2,500 each. (Stlmt. ¶ 18).

### 4. The release and attorney's fees

In return for the aforementioned benefits, the Class must release Time Warner from "all claims which have been or could have been alleged in this suit relating to Time Warner's privacy notice and subscriber information disclosure practices arising under 47 U.S.C. § 551 or any similar federal or state consumer protection law and/or privacy law." (Stlmt. ¶ M). Time Warner is defined by the Proposed Settlement as "Time Warner Cable, Inc., all of the divisions of it or its predecessors during the Class Period, along with all of its predecessors, successors, affiliated companies (including, but not limited to, Time Warner Entertainment Company, L.P., and Time Warner Inc.), and officers and directors." (Stlmt. ¶ Q).[15]

Finally, the Proposed Settlement includes an agreement that Time Warner "will pay Plaintiffs' attorneys' fees and expenses, in the total amount of $5 million." (Stlmt. ¶ 29).

---

**13.** Wayne L. Pines is the "executive Vice President of GCG Communications, a division of The Garden City Group, Inc. ('GCG')." GCG Communications specializes in the design and implementation of legal notification programs. (Pines Aff. ¶ 1).

**14.** That notice was also published in Spanish. (*Id.* ¶ 11). Pines calculated the total number of planned advertised notices to be 119,621,642, and that if the figure were calculated to include the "pass-along" rate, or the number of additional people who would view the publications, it was estimated that more than 518 million people would see the published notice. (Pines Aff. ¶ 12). Pines calculated that 80% of the class would be reached by this plan an average of 3.34 times each. (Pines Aff. ¶ 15).

**15.** They also contend that the release of Time Warner affiliates, including its successors in interest, from the claims litigated here is unfair to Category III and IV plaintiffs. However, "class action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal–Mart Stores Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 109 (2d Cir.2005) (citations omitted). The release of Plaintiffs' claims against potential non-party defendants, therefore, cannot impede the settlement.

## B. Objections to the Proposed Settlement

The Court focuses upon those objections raised and briefed by the Loburs, as they cut to the heart of the fairness and certification standards which the Court must apply. Although numerous other objections were made before and during the fairness hearing, the Court does not have occasion to reach them, since the following problems compel the Court to find that the settlement was not fair, reasonable or adequate. The Loburs object and seek intervention on behalf of themselves and all others similarly situated, which they define as Category III and Category IV class members.[16] In support of intervention, they challenge the fairness of the Proposed Settlement on several grounds:

(1) The Proposed Settlement is unfair to Category III class members because it forces them "to transfer their benefit to someone who lives in an area served by Time Warner, which is no benefit at all." (Lobur Obj. at 7). It is similarly unfair to Category IV class members because "they receive no benefit under the settlement agreement," yet must release all related claims against Defendants. (*Id.* 9).

(2) The notice provisions of the Proposed Settlement are inadequate since only Category I class members received individual notice. Objectors assert that the fact that the provision is intended to give actual notice to only 10% of the entire Class makes it unacceptable where, as here, Defendants have "a list of the names and addresses of all Category II, III, and IV Class Members." (Lobur Obj. at 12).

(3) Class counsel did not adequately represent the interests of the entire class. The fact that Category III and IV Class members are "unjustly discriminated against based on their subclass" shows, in the Loburs' view, that representation was inadequate. (Lobur Obj. at 13).

The Loburs' three arguments attack two components of the Proposed Settlement, the notice provisions based on 23(b)(3) class certification, and the fairness of the private benefits allocated to Category III and IV members.

## DISCUSSION

### I. Class Settlements

When court approval of a settlement is sought prior to class certification, the district court must also determine whether or not a class can be certified pursuant to Fed. R.Civ.P. 23(a) & 23(b). "A class settlement cannot technically be approved unless, by definition, a class is upheld." 4 *Newberg on Class Actions* ("*Newberg*") § 11.27 (4th ed.2006). *See also In re Gen. Motors Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 796–97 (2d Cir.1995) (a fairness hearing cannot be a surrogate for Rule 23 class certification findings). In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 2239, 138 L.Ed.2d 689 (1997), the leading case on settlement class certification, the Supreme Court held that Rule 23 certification requirements applied to settlement-only classes in all respects, save that trial manageability concerns need not be evaluated, since settlement obviated the need for trial. Certification and fairness criteria are important even though the parties have agreed to settle because those criteria were "designed to protect absentees by blocking unwarranted or over-broad class definitions," meriting "heightened attention in the settlement context." *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1145 (8th Cir.1999) (citing *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231); *see also General Motors,* 55 F.3d 768 (3d Cir.1995).

### II. Rule 23(a)

The Court must conduct a "rigorous analysis" and "be persuaded that the prerequisites of Rule 23(a) have been met." *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Pecere v. Empire Blue Cross and Blue Shield,* 194 F.R.D. 66, 69 (E.D.N.Y.2000). The class action requirements embodied in 23(a) are numerosity, commonality, typicality and adequacy of representation.[17] At the Fairness

---

**16.** Defendants' counsel indicates by letter that the Loburs are not on the January 1999 LSDB, and therefore qualify as "Category IV" class members. Although the Court has not been presented with this LSDB, neither the parties nor objectors dispute this classification.

**17.** Rule 23(a) states:

Hearing, the Court noted that these factors appeared to have been satisfied and asked if any party disagreed, to which no reply was heard. (May 19, 2006 Fairness Hearing, Trans. 5:14–25). The Court reviews the 23(a) factors as a matter of form.

## A. Numerosity

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *In re Initial Public Offering Sec. Litig.,* 227 F.R.D. 65, 88–89 (S.D.N.Y.2004). Plaintiffs must show that joinder is "impracticable," not that it is "impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). The Second Circuit has held that numerosity is presumed when a class consists of forty or more members. *See Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995).

The Court finds that Plaintiffs have satisfied the numerosity requirement because the potential class includes millions of Time Warner cable subscribers. Because the putative class is so large, it is clear that joinder is impracticable and thus Plaintiffs have satisfied the numerosity requirement under Fed. R.Civ.P. 23(a)(1).

## B. Commonality and Typicality

■ The commonality element of Rule 23(a)(2), which requires the plaintiff to demonstrate that common issues of law or fact exist and affect all class members, is considered a "minimal burden for a party to shoulder." *Lewis Tree Service, Inc. v. Lucent Technologies Inc.,* 211 F.R.D. 228, 231 (S.D.N.Y.2002). Individual circumstances of the class members can differ without precluding class certification so long as "common questions are at the core of the cause of action alleged." *Vengurlekar v. Silverline Technologies, Ltd.,* 220 F.R.D. 222, 227 (S.D.N.Y.2003) (internal quotations and citations omitted).

■ A named plaintiff's claims are "typical" pursuant to Rule 23(a)(3) where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability. *See Robinson,* 267 F.3d at 155. "The rule is satisfied ... if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A. v. Giuliani,* 929 F.Supp. 662, 691 (S.D.N.Y.1996), *aff'd,* 126 F.3d 372 (2d Cir.1997).

Accordingly, the commonality and typicality requirements " 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.' " *Caridad,* 191 F.3d at 291 (alterations in original) (quoting *General Tel. Co.,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364).

Here, there is no contention that the facts giving rise to Time Warner's purported liability are so different with respect to either the notice or the substantive violation claims as to reject certification on the basis of commonality. The claims are derived from the same legal theory and are based upon the same factual question—whether class members were injured because of Time Warner's disclosure of their PII without properly notifying them of that practice. The results of class certification discovery have revealed that Time Warner did sell PII, and that all class members were potentially subject to that practice, but only some of the LSDBs remain, making it more difficult for some class members to prove that they were actually subject to the practice. This evidentiary problem does not rebut the fact that the claims arise from the same factual predicates. Additionally, it would not appear as grave a problem here, where the class only sought statutory damages, so determining those eligible for benefits would be as simple as cross-referencing names on a master list.

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Therefore, the Court finds that the class meets the commonality and typicality requirements, since the claims "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol,* 929 F.Supp. at 691.

## C. Adequate Representation

█ There is "no simple test for determining if a class will be adequately represented by a named plaintiff" and "each case must be approached on an individualized basis." *In re LILCO Secs. Litig.,* 111 F.R.D. 663, 672 (E.D.N.Y.1986). Among the factors to be reviewed are "the representative's understanding and involvement in the lawsuit," "the willingness to pursue the litigation," and "any conflict between the representative and the class." *Id.* (citing *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562–63 (2d Cir. 1968)).[18] *See In re Metlife Demutualization Litig.,* 229 F.R.D. 369, 376 (E.D.N.Y.2005) (citing The Advisory Committee Notes to the 2003 Amendments to Federal Rule 23(g), effective December 1, 2003).

The Court finds that Parker and DeBrauwere are adequate to represent the interests of the class. Parker's and DeBrauwere's deposition testimony exhibited sufficient knowledge concerning the privacy claims they assert to meet the knowledge requirement under Rule 23(a). *See, e.g.,* Parker Dep. at 38, 60, 82–85, DeBrauwere Dep. at 15, 37; *see generally 1 Newberg* § 3.34. Both named Plaintiffs also understand their role as class representatives. (Parker Dep. at 202; DeBrauwere Dep. at 49). The Court finds that the class representatives are sufficiently knowledgeable about the case to warrant certification. *See Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 201 (S.D.N.Y. 1992) (finding class representative adequate even though he was unaware of the nuances of the legal theory in the case); *see also*

*Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 102 (S.D.N.Y.1981); *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 243 (E.D.N.Y.1998); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 62 (2d Cir.2000).

## II. Rule 23(b)

Rule 23(b) imposes additional requirements for class certification based upon the type of class sought to be certified. Certification of 23(b)(2) and 23(b)(3) classes is sought, so those standards are considered in turn.

### A. Rule 23(b)(2)

#### 1. Law

##### a. Notice for 23(b)(2) classes

Both 23(c) and 23(e)[19] impose notice requirements relevant to class certification. Rule 23(c)(2)(A) defines the notice requirements for 23(b)(1) and 23(b)(2) classes, stating that "the court may direct appropriate notice to the class."

Notably, the statute does not require that Plaintiffs' counsel give actual individual notice to each member of the class. The Court therefore finds that the notice program outlined in the Pines Affidavit and preliminarily certified by this Court satisfies this requirement.

##### b. Standards for 23(b)(2) class certification

Rule 23(b)(2) precludes certification unless: [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

---

**18.** It used to be that the adequacy of class counsel was evaluated under the 23(a)(4) representation prong. It is now more properly considered under Rule 23(g). Rule 23(g) states in pertinent part:

23(g)(1)(A) ... a court that certifies a class must appoint class counsel.

(B) An attorney appointed to serve as class counsel must fairly and adequately represent the interests of the class ... the court must consider: the work counsel has done in identifying or investigating potential claims in the

action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law' and the resources counsel will commit to representing the class.

**19.** Rule 23(e)(1)(B) provides: "The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise."

Subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *See* Rules Advisory Committee Notes to 1966 Amendments to Rule 23 (reprinted at 39 F.R.D. 69, 102 (1966)).

■ In the Second Circuit, a determination of whether or not money damages predominate and thus prevent 23(b)(2) certification is based on the "ad hoc" criteria announced in *Robinson*. *Parker*, 331 F.3d at 18 (citing *Robinson v. Metro–North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir.2001)). *Robinson* states that a district court

> may allow (b)(2) certification if it finds in its informed, sound judicial discretion that (1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

267 F.3d at 164 (internal quotations omitted). In order for injunctive or declaratory relief to "predominate," the district court must determine that

> (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.

*Parker*, 331 F.3d at 20 (citing *Robinson*, 267 F.3d at 164).

In *Parker*, the Second Circuit noted the applicability of *Robinson* to this case. It held that the *Robinson* approach required the district court to permit some discovery before deciding the certification question. 331 F.3d at 20. It also noted that the ad hoc approach in *Robinson* "suggests, without deciding, that incidental damages claims should ordinarily be certified along with injunctive and declaratory relief claims under Rule 23(b)(2)." *Parker*, 331 F.3d at 20 (citations omitted). The Court of Appeals reached this conclusion based upon the fact that in such cases incidental damages flow directly "from a finding of liability on the … claims for class-wide injunctive and declaratory relief." *Id.* Therefore, a determination under *Robinson* requires the Court to first decide whether the damages claim predominates over the injunctive and declaratory relief claims. If damages do not predominate, and the claimed damages are simply incidental, then the Court should certify those claims as well under 23(b)(2).

### 2. Application

■ The parties do not specify under which prong the class should be certified for settlement purposes, despite Plaintiffs' having done so in their now terminated motion for class certification.[20] The Proposed Settlement does not suggest that a 23(b)(2) "injunction only" class be certified—a class that Magistrate Judge Azrack and this Court agreed would have been proper (*see Parker*, 198 F.R.D. at 380–81 (Glasser, J.); *Parker v. Time Warner Entertainment Co.*, No. 98–cv–4265, 2000 WL 34430454, at *3 (E.D.N.Y. 2000) (Azrack, Mag.))—despite having been persuaded that "plaintiffs are not primarily seeking injunctive or declaratory relief." *Parker*, 198 F.R.D. at 381. Since the Proposed Settlement does not suggest that the parties would accept an injunction-only settlement of the claims under 23(b)(2), the Court need not consider this hypothetical.

However, as the Second Circuit's vacatur and remand of this Court's 2001 decision makes clear, *Robinson* permits claims for injunctive relief combined with incidental damages remedies to be certified under 23(b)(2), meaning that this settlement could theoretically be certified under either 23(b)(2) or 23(b)(3).

---

**20.** The preliminary statement for Plaintiffs' now terminated motion, from which much of the language for the Joint Memorandum for Final Approval was apparently taken, indicates that "Plaintiffs move for certification of an injunction and declaratory relief class under Rule 23(b)(2) and a damages subclass under Rule 23(b)(3)." (Pls. Mot. Class Cert. 1). This language is omitted from the Joint memorandum for Final Approval.

Evaluating the merits of a 23(b)(2) class certification under *Robinson*, the Court concludes that the injunctive relief sought is "insignificant," and therefore does not meet the 23(b)(2) predominance requirement. The Amended Complaint itself makes only broad requests for injunctive and declaratory relief, seeking "that defendants . . . be enjoined and restrained from . . . continuing to engage in the violations of the Cable Act and State law," and "that the Court issue a declaratory judgment and adjudge and decree that defendants have committed the violations of federal and state law alleged herein." (Am. Compl. ¶ 105).

As stated previously, the defendants in this case altered their practices almost immediately with respect to the language of the original notice as well as the list sales business itself. The Stipulation of Settlement clearly states that Time Warner no longer operates a list sales business. (Stlmt. ¶ 14). Plaintiffs did not seek to amend the Amended Complaint to assert a violation of § 551(c) against new notices issued by Time Warner thereafter. It would appear, therefore, that there is no continuing or even imminent behavior by Time Warner left to enjoin.

The Amended Complaint's second request for declaratory relief is nothing more than a request for a declaration of liability for past violations of the Cable Act, a declaration that would only replicate what Plaintiffs would have been entitled to at law had they proceeded with and prevailed upon their claims. Moreover, a plaintiff asserting a claim for declaratory relief cannot rely upon past injury alone. *See, e.g., McCormick v. School District of Mamaroneck,* 370 F.3d 275, 284 (2d Cir.2004); *see also City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The requested declaratory relief, however, pertains to practices that ceased over seven years ago.

The remainder of the relief requested includes restitution statutory damages, attorney's fees and costs and prejudgment interest. (*Id.*). That relief is neither "injunctive"

nor "declaratory," and therefore cannot justify 23(b)(2) certification.

Further confirming this view is the fact that all of the relief provided for in the Proposed Settlement fails to satisfy the predominance guidelines provided by *Robinson*. The Proposed Settlement compels Time Warner to make revisions to the current Privacy Notice, about which no violations are alleged. Having reviewed that edited document, the Court finds the changes to be cosmetic and "insignificant." [21] At any rate, since Time Warner has discontinued its list sales business, it appears that none of the changes made were predicated upon solving the violations alleged in the Amended Complaint. The Proposed Settlement states as much.[22]

The Proposed Settlement also provides that: (1) Class Counsel will review Time Warner's Privacy Notices for three years; (2) that Time Warner will appoint a "Chief Privacy Officer" whose duties will include ensuring "compliance with the privacy provisions of the Cable Act" and other applicable laws; and (3) that cy pres relief totaling $500,000 will be provided to two law school privacy law programs. (*Id.*).

Reviewing these forms of relief, the Court asks a question compelled by *Robinson:* "even in the absence of a possible monetary recovery," would "reasonable plaintiffs bring the suit to obtain the injunctive or declaratory relief sought"? *Robinson,* 267 F.3d at 164. The Court is driven to answer that question in the negative. None of the equitable relief identified by the Proposed Settlement would provide the Plaintiff with a remedy for prior § 551 violations, nor act against similar, future harms. Having a Chief Privacy Officer might facilitate greater vigilance against privacy invasions, and the cy pres relief might produce innovative legal solutions to privacy rights issues that would then redound to the benefit of plaintiffs, but these solutions are so attenuated or marginally beneficial that it cannot reasonably be ar-

---

**21.** The changes are identified at "Exhibit 4" to the Stipulation of Settlement.

**22.** The Proposed Settlement states that "should time Warner pursue a National List Sales Business in the future, it shall revise the Privacy Notice to the extent deemed necessary by Time Warner to disclose that business practice." (Stlmt. ¶ 14).

gued that a plaintiff would litigate to achieve those ends. Indeed, after Time Warner ceased selling lists, it is difficult to imagine what would motivate continued prosecution of the claims—other than, of course, money. Indeed, the fact that Plaintiffs have continued to litigate the issue even after those changes indicates quite clearly that the motivating factor is the damage award.

There is a second *Robinson* question: would "the injunctive or declaratory relief sought ... be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits"? *Id.* Arguably, the relief would be "appropriate" were the Plaintiffs to prevail on the merits. But the language of *Robinson* also asks if it would be "reasonably necessary." It would not be. While the relief offered is related to the privacy rights violations alleged, it is not a reasonably necessary means of preventing continued abuses or remedying past ones. As such, the Court concludes that they are more akin to the "insignificant or sham" requests for injunctive relief which the *Robinson* court stated "should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

Finally, discretion cautions against 23(b)(2) certification. The Proposed Settlement essentially releases the potential claims of all class members for statutory damages, and provides for an opt-out just as one would be for a 23(b)(3) class. In his concurrence in *Parker*, Judge Newman was doubtful of treating what is essentially a damages class under 23(b)(2) because, in his words, "such devices strike me as a way of undermining

the 23(b)(3) requirement that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" 331 F.3d at 25. While *Robinson* underscored the flexibility that Rule 23 provides to district courts in certifying classes, it does not suggest that 23(b)(3) requirements should be relaxed for class actions that are clearly based upon the damage awards sought, and the release of claims provided in return.[23] *See Robinson,* 267 F.3d at 166.

## B. Rule 23(b)(3)

Rule 23(b)(3) applies to class actions for damages and requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

The Court does not have occasion to reach the question of whether the Proposed Settlement satisfies the 23(b)(3) factors, since the record does not show that the more stringent notice requirements imposed upon 23(b)(3) classes have been complied with.

### 1. Notice Requirements for 23(b)(3) Classes

In contrast to the more lenient 23(b)(2) requirements, Rule 23(c)(2)(B)[24] provides stringent notice requirements for 23(b)(3) classes. For 23(b)(3) certification,

> the court must direct to class members the best notice practicable under the circumstances, including individual notice to all

**23.** *Robinson* suggests, in effect, that this problem can be resolved by imposing 23(b)(3) requirements on a 23(b)(2) certified class. 267 F.3d at 166 ("... any due process risk posed by 23(b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members for those portions of the proceedings where the presumption of class cohesion falters ... i.e., the damages phase of the proceedings. A district court acting under its Rule 23(d)(2) discretionary power may require that an opt-out right and notice thereof be given should it believe that such a right is desirable to protect the interests of absent class members"). That suggestion appears unworkable in this context. First, the suggestion really contemplates a situation in which certification occurs before a settlement, leaving

the possibility that the liability and damages determinations be made separately. Second, the Court may not simply modify a settlement that does not meet Rule 23 requirements—it may only accept or reject it. Here, the Proposed Settlement contemplates a particular form of notice which, for all intents and purposes, was a component of the settlement itself. Third, as discussed below, the notice so far provided would be inadequate for 23(b)(3) certification. Were the Court to certify under 23(b)(2) and import the standards of 23(b)(3), the Proposed Settlement would fail for lack of notice.

**24.** That subsection also provides the information that must be provided in the notice in "plain, easily understood language." Rule 23(c)(2)(B). No challenge to the content of the notice has been made.

members who can be identified through reasonable effort.

Since 23(b)(3) classes, unlike 23(b)(2) classes, may result in the waiver of potential claims or defenses, due process requires that putative class members receive notice that their claims are being adjudicated. Indeed, the Rule 23 Advisory Committee Notes, 1966 Amendment, clearly indicate that the notice requirements of both 23(c)(2) and 23(d)(2) are "designed to fulfill requirements of due process to which the class action procedure is of course subject." (citing *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). That Advisory Committee note further states that the 23(c)(2) notice requirements are "not merely discretionary." (Advisory Committee Notes, 1996 Amendment).

The question of what notice will satisfy the requirements for 23(b)(3) classes [25] was definitively addressed in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).[26] In *Eisen*, the Supreme Court considered the Second Circuit's reversal of a district court determination that a notice program for a 23(b)(3) class complied with the 23(c)(2) requirements. The district court had found that the plaintiff class consisted of some six million odd-lot stock purchasers, over two million of whom were identifiable by reasonable efforts. *Eisen*, 417 U.S. at 166, 94 S.Ct. 2140. The majority of those two million purchasers could be identified "by comparing the odd-lot firms' computerized records of these teletype transactions and the general-services brokerage firms' computerized records of all customer names and addresses." *Id.* at 166 n. 5, 94 S.Ct. 2140. Despite explicitly finding that several million class members could be readily identified and notice sent to them as a cost of $225,000 (in pre–1974 dollars), the district court concluded that neither Rule 23(c)(2) nor the Due Process Clause required such a substantial expenditure at the outset of the litigation. The district court therefore pro-

vided that: (1) individual notice be given to major institutions that might have odd-lot trading clients; (2) individual notice be given to 2,000 identifiable class members with 10 or more odd-lot transactions during the relevant period; (3) individual notice be given to 5,000 more class members selected at random; and (4) that notice be published in the Wall Street Journal and other papers in the country. The Court further provided that the cost of that notice, $21,720, be imposed upon the defendants if a strong showing of likelihood of success on the merits could be made. After a hearing, the district court found the requisite likelihood of success and imposed 90% of the cost of notice upon defendants.

The Second Circuit reversed. *See id.* at 166–68, 94 S.Ct. 2140 (describing Second Circuit opinion). The Supreme Court granted certiorari to consider two questions: whether the notice requirements were satisfied by the district court notice order, and whether that court could impose the cost of the notice program on defendants, holding that the district court's resolution was erroneous in both respects. *Id.* at 172, 94 S.Ct. 2140. Only the first question is relevant here.

The Supreme Court held that the unmistakable language of 23(c)(2) imposed a duty to provide the "best notice practicable" to all names and addresses obtainable through reasonable effort and that such an obligation was non-discretionary. *Id.* at 175, 94 S.Ct. 2140. As a result, it concluded that since the names and addresses of over two million class members were easily ascertainable, individual notice had to be sent to each. The Supreme Court rejected the plaintiffs' protestation that the cost of notice was in excess of the value of the claim, noting that "there is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocket books of particular plaintiffs." *Id.* at 176, 94 S.Ct. 2140.

*Eisen's* limitations have been strictly followed in the context of 23(b)(3) class certifi-

---

**25.** *Eisen* clearly stated that its discussion was inapplicable to the notice requirements imposed by 23(b)(1) and 23(b)(2) classes. *Eisen*, 417 U.S. at 177 n. 14, 94 S.Ct. 2140. Therefore, this discussion is only applicable to the parties' 23(b)(3) certification request.

**26.** That case was subject to numerous opinions which have frequently been referred to as "Eisen I, Eisen II" and so forth. Only this iteration of that legal battle is relevant here, and is thus referred to simply as "Eisen."

cation. *See, e.g., In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir.1977) (collecting cases and holding that plaintiffs were obligated to review roughly 1.7 million "retail dealer report cards" in order to obtain the last known address of class members so that individual notice might be sent to them); *see also Abrams v. Interco Inc.*, 719 F.2d 23, 30 (2d Cir.1983) (Friendly, J.). Indeed, a certified class action settlement not complying with 23(b)(3) notice requirements cannot have a *res judicata* affect on subsequent damages claims. *Johnson v. General Motors Corp.*, 598 F.2d 432 (5th Cir.1979) (a class action seeking monetary relief cannot be barred according to principles of *res judicata* by a previous class action in which no notice to absent class members was provided); *Besinga v. United States*, 923 F.2d 133 (9th Cir.1991) (same).

*Abrams* is particularly on point. That case involved a private antitrust action for treble damages based upon allegations that defendant had engaged in a price-fixing agreement involving their footwear and other apparel. The parties entered into a settlement agreement by which defendants would pay treble damages on the additional prices that plaintiffs paid as a result of the alleged price-fixing agreement. The total number of class members was estimated to be roughly 3,173,-000. *Id.* at 30. Despite the enormity of the class, the court compelled the parties to examine existing sales records from the various retailers to determine as closely as possible how many of those individuals could be identified and have individual notice sent to them.

### 2. Application

■ The Loburs object to the notice provided here, contending that 23(b)(3) certification requires the best notice practicable, including individual notice to all individuals identifiable through reasonable effort, and that on the facts of this case the parties were obligated to update the old addresses of former Time Warner subscribers and send individual notice to them.

At the Fairness Hearing, the Loburs introduced the "Statement of Anne Stash," (hereinafter "Stash Stmt.") in lieu of an Affidavit and pursuant to Local Civil Rule 1.10. The Stash Statement indicates that she is an Account Executive for AccuData America. (Stash Stmt. ¶ 2). Stash evaluated the expected costs of updating "the names and addresses of 16 million consumers which are presently contained in a database that was created in January 1999." (Stash Stmt. ¶ 5). She estimated that by uploading the records into "licensed NCOALink software" and "CASS" certifying the updated list, the new list would become 90% accurate, assuming the "mail pieces were sent immediately after the database was updated." (Stash Stmt. ¶¶ 7–8). She estimated the total cost of this endeavor to be "$22,400.00 for 16 million name and address database records." (Stash Stmt. ¶ 10).

The Stash Statement and the Keough Affidavit are at odds, since the Keough Affidavit indicates that NCOA updates would not effectively update a 1999 list six years after the fact, while the Stash Statement indicates that such a list could be updated to 90% accuracy in 2006, at a cost that, in terms of the overall litigation, is not prohibitively expensive.[27] Nothing else in the record has been brought to the Court's attention to reconcile these conflicting positions. If Stash were correct, the (c)(2) notice requirement would have almost certainly been violated by the parties' failure to update the names and addresses of all "non-Category I" class members at a price that pales in comparison to the amounts already expended, the value of the current settlement, and the attorneys' fees sought. Moreover, it appears that the non-Category I class members' names could have been updated by using the same database actually employed by GCG to update the names of Category I members. However, were Keough correct that a seven year old database could not be updated, the Proposed

---

**27.** The Stash Statement does not contemplate the cost of actually mailing notice to 16 million individuals, which Keough estimates to be $0.44 per notice package. (Keough Aff. ¶ 10). Multiplying those figures, the total cost would be the not insignificant sum of $7,040,000. However, as stated in *Eisen*, when information permitting individual notice may be reasonably obtained, the notice requirements that (c)(2) imposes cannot be limited simply because it is too costly. *Eisen*, 417 U.S. at 176, 94 S.Ct. 2140.

Settlement's Notice Plan would have been the best practicable.

With regard to onerous notice obligations imposed upon plaintiffs seeking 23(b)(3) certification, Judge Friendly encapsulated the problem in a manner quite applicable here: "[P]laintiffs are the victims of their own ambitions in seeking certification of a nationwide class of buyers of all [of defendant's] products." *Abrams,* 719 F.2d at 31. There are no rules which provide for less than the best notice practicable simply because of the size of the class, where the names and address of class members are or may be known with reasonable effort. The burden is upon the proponents of the settlement to show that certification requirements have been complied with. *In re General Motors,* 594 F.2d at 1106. With respect to notice, that burden has not been met, and therefore the Court must deny final approval of a settlement under 23(b)(3). The Court does not reach the question of whether the substantive 23(b)(3) factors were satisfied. However, because the Proposed Settlement suffers from serious fairness concerns the Court addresses those issues as well.

## III. Fairness of the Proposed Settlement

### A. Fairness Standards

Rule 23(e) mandates that a district court "must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Fed. R.Civ.P. 23(e)(1)(A). "The reason that judicial approval of the settlement of such an action is required ... is that the negotiator on the plaintiffs' side, that is, the lawyer for the class, is potentially an unreliable agent of his principals." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago,* 834 F.2d 677, 681 (7th Cir.1987) (Posner, J.). Class members generally have little incentive or capacity to monitor the activity of their lawyers, who generally have much more to gain from the class settlement than any individual plaintiff on whose behalf suit was brought. Since, as a practical matter, putative class members are hardly capable of ensuring vigorous representation, Rule 23 imposes that obligation upon the judge.

Rule 23(e) thus specifies that, "the court may approve a settlement, voluntary dismiss-

al, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). Furthermore, "any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)." Fed.R.Civ.P. 23(e)(4)(A).

## B. Relevant Factors for Fairness
### 1. Fair, Reasonable, and Adequate

Discretion to approve or deny a settlement lies with the trial court. *In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 473 (S.D.N.Y.1998) (citing *In re Ivan F. Boesky Sec. Litig.,* 948 F.2d 1358, 1368 (2d Cir.1991)). The law favors the settlement of class actions, particularly where substantial judicial resources may be conserved by avoiding litigation. 4 *Newberg* § 11.41. Nevertheless, the settlement must be fair, reasonable, and adequate, and the burden of proving the fairness of any settlement is on the proponents. Fed.R.Civ.P. 23(e)(1)(C); *see also* 4 *Newberg* § 11:42. (citing *In re Gen. Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106 (7th Cir.1979)).

Courts look at numerous criteria to determine whether a particular settlement is fair, reasonable and adequate. The leading treatise on class actions collects the following criteria: (1) the likelihood of recovery, or likelihood of success; (2) the amount and nature of discovery or evidence; (3) the settlement terms and conditions; (4) recommendation and experience of counsel; (5) future expense and likely duration of litigation; (6) recommendation of neutral parties, if any; (7) number of objectors and nature of objections; and (8) the presence of good faith and the absence of collusion. (4 *Newberg* § 11:43 (citing Manual for Complex Litigation (3d ed.) § 30:41)). Other factors which may also be considered include whether the named plaintiffs are the only class members to receive monetary relief; whether the settlement amount is much less than sought in the complaint; whether major claims or types of relief have been omitted from the settlement; whether particular subclasses are treated

very differently than others; and whether claimants who are not members of the class are treated significantly differently. *Id.*

The most frequently cited case on these standards in this Circuit is *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). In *Grinnell*, the Second Circuit approved of the particular factors considered by the district court, factors which were essentially the same as those enumerated above. In addition, *Grinnell* considered whether the defendants could withstand a greater judgment and the range of reasonableness of the settlement fund in light of the best possible recovery. *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir.2001).

When evaluating a settlement proposal, the Court asks whether it falls within the range of reasonableness. 4 *Newberg* § 11:45 (citing *Newman v. Stein*, 464 F.2d 689 (2d Cir.1972)). Courts may consider cash and non-cash considerations as long as the total consideration for the class members is sufficient. 4 *Newberg* § 11:46; *see also Hammon v. Barry*, 752 F.Supp. 1087 (D.D.C. 1990). However, a total lack of value exchanged for a release of claims is a strong indicator that a settlement is unfair, at least with respect to those disadvantaged members of the class. *See Petruzzi's Inc. v. Darling–Delaware Co., Inc.*, 880 F.Supp. 292 (M.D.Pa.1995) (discussed below). Indeed, the legal principles of fairness, adequacy, and reasonableness apply with equal force to the allocation of settlement benefits as they do to the overall settlement award. *See Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983) (citing *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir.1982)). Moreover, distributional inequities may overcome any presumption that a settlement produced by competent attorneys is fair, since there are adequacy concerns with "a settlement that offers considerably more value to one class of plaintiffs than to another," in which case the representatives "may be trading the claims of the latter group away in order to enrich the former group." *In re General Motors Pick–Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 797 (3d Cir.1995).

As this discussion makes clear, a settlement must be procedurally and substantively fair and not discriminate arbitrarily amongst the class. Procedurally, the Court must look at the process by which the settlement was created, including the presence or absence of collusion and the type and variety of discovery taken. It must also consider other indicia of fairness, including neutral opinions on the settlement's merits, and the quality and experience of class counsel. Substantively, the Court must consider the settlement's terms in relation to theoretically possible awards, the attendant risks of further litigation, and the ability of the defendant to actually pay such an award upon judgment. Courts must also evaluate distributional fairness, including whether parts of the class are treated differently in an arbitrary fashion and whether named plaintiffs are the only ones to receive cash awards.

### a. Procedural and substantive fairness

■ Through the parties' briefs and at the fairness hearing, it was made clear that the Proposed Settlement was procedurally and substantively fair. First, the Proposed Settlement was a product of a long legal battle between Plaintiffs and Time Warner, and was only arrived at after a committed litigation of the class claims, spanning, to date, eight years. The case has been subject to much scrutiny, including several court opinions, and Plaintiffs successfully appealed the denial of class certification by this Court. The parties have undertaken significant discovery and are well-positioned to estimate the value of the Plaintiffs' claims and the expected costs of continued litigation. There is neither allegation nor evidence that the Proposed Settlement was the product of collusion between the parties. Therefore, the Court finds that the Proposed Settlement is procedurally fair.

Second, contemplating the settlement awards offered to Category I and II class members, there are no significant substantive challenges to the award. The hearing made clear that there are significant impediments to proof of damages should the case go to trial. As this Court and the Second Circuit noted, this case raises non-trivial litigation risks embedded in novel questions of law. The Second Circuit's decision to vacate and remand left open the ultimate question of whether such an enormous class armed

with a statutory damage minimum could pursue a largely technical violation of the statute without violating due process. 331 F.3d at 22. Judge Newman noted the manageability concerns of a class of 14 million cable subscribers, inferring that it might plausibly justify denying class certification for reasons of manageability. *Id.* at 27 (Newman J., concurring) (citing *Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412 (S.D.N.Y. 1972) (denying a motion for class certification of statutory damages claims as a "horrendous, possibly annihilating punishment.")). There is also a question of whether the Supreme Court case of *Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004), which limits the minimum statutory damage award under the federal Privacy Act, 5 U.S.C. § 552a(b), to those plaintiffs who can prove actual damages, would be applicable here, significantly lowering the expected range of recovery. For these purposes it suffices to say that there is significant litigation risk, and, employing the "range of reasonableness" standard articulated above, the Court finds that the in-kind awards fall within that range as a form of recovery.

### b. Distributional fairness

The only aspect of the fairness inquiry which raises concerns, one at the core of the class action mechanism, is whether similarly situated class members are treated the same by the settlement. Indeed, where a proposed settlement provides favorable treatment to some segment of the class, careful judicial scrutiny is required to prevent injustice and to "ensure that the burden of settlement is not shifted arbitrarily to a small group of class members." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983); *see also Consolidated Edison, Inc. v. Northeast Utilities,* 332 F.Supp.2d 639, 651 (S.D.N.Y.2004).

Although the *Grinnell* factors do not mention distributional fairness, the notion inheres to the nature of the class action and, when relevant, has provided a basis upon which to reject unfair settlement proposals. First, the distributional fairness requirement dovetails with the rationale underlying Rule 23(e), which requires judicial approval of settlement in order to protect silent members of the class from collusion or self-serving behavior by the representative parties, their

attorneys, or both. "Because of the limited control exercisable by class members, class settlements are susceptible to abuse." *Plummer v. Chemical Bank,* 668 F.2d 654, 658 (2d Cir.1982) (citing *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)).

In addition, the Advisory Committee Notes, 2003 Amendments, endorse an inquiry into distributional fairness. The Notes on subsection 23(e)(1) cite *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 316–324 (3d Cir.1998) as a "helpful review of many factors that may deserve consideration." *Prudential* instructs district courts to consider "whether persons with similar claims will receive similar treatment, taking into account any differences in treatment between present and future claimants." *Id.* at 324 (citing Judge William Schwarzer, *Settlement of Mass Tort Class Actions: Order Out of Chaos,* 80 Cornell L.Rev. 837, 843–44 (May 1995)).

Second, distributional fairness standards have been imposed by the case law. In *Petruzzi's Inc. v. Darling–Delaware Co., Inc.,* 880 F.Supp. 292, 299 (M.D.Pa.1995), for example, the district court held that a settlement by one of several defendants for the benefit of a subsection of the class in which 50% of the class would not receive "premium certificates," but would have their claims against that defendant discharged, is so unfair as to justify rejecting the settlement.

The *Petruzzi's* court found Judge Friendly's admonition in *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981), elicited under different circumstances, particularly appropriate. Regarding the waiver of claims not described in the complaint and which fell outside of the time period defining the class, Judge Friendly noted that "[a]n advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of [class] members." *Petruzzi's,* 880 F.Supp. at 300 (quoting *National Super Spuds,* 660 F.2d at 19).

Similarly, in *Plummer, supra,* the Second Circuit upheld a district court denial of a settlement class. In *Plummer,* a case deal-

ing with racial discrimination in the defendant's promotion practice, the proposed settlement provided for an advancement in rank of only the named plaintiffs, even though no distinction was made between them and the unnamed class they represented.

This is not to say that there are no circumstances in which class members may be compensated differently. To the extent that the claims of class members are distinguishable based upon differences intrinsic to the lawsuit, asymmetrically allocated damage awards may be justified. For example, in *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319 (S.D.N.Y.2005), the court dealt with a class action by investors asserting that they had relied upon misrepresentations in purchasing Worldcom stock at inflated prices. They sought relief against numerous defendants, including underwriters, auditors, and corporate officers and directors involved with Worldcom during that period. 388 F.Supp.2d at 322. The settlement class period included all of those who "acquired or publicly traded securities of WorldCom during the period beginning April 29, 1999 through and including June 25, 2002, and who were injured thereby." *Id.* at 323. The class definition included purchases made prior to the period in which Worldcom earnings were restated, but did not compensate those claims for their releases. *Id.* It was argued that this lack of compensation was unfair. The district court disagreed, noting that "settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.... Fairness does not require that Class Members be compensated for losses stemming from purchases at prices that it would be extraordinarily difficult to argue were inflated by the malfeasance alleged in the complaint." *Id.* at 343 (citing *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir.2005)).

### i. Category IV members

■ Objectors assert that the Proposed Settlement is unfair to the roughly 10 million Category IV plaintiffs. Even though their names are not on the LSDB used to define the class, objectors assert that at least some

number of them were likely on a prior list sales database and had their information sold, and so it is unfair to them that they should be forced to release their claims without receiving any consideration in return.

Defendants were under no affirmative obligation to maintain the PII contained in their list sales database, and in fact the Cable Act required that they destroy all "personally identifiable information if the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (d) of this section or pursuant to a court order." 47 U.S.C. § 551(e).

Discovery in this case has indicated that most of the former iterations of the LSDB either no longer exist or are unrecoverable, although Time Warner's counsel concedes that several tapes containing potentially retrievable LSDBs from 1996 were produced during discovery and may contain other names. ("Fairness Hearing," May 19, 2006, Trans. 19:4–12). Aside from those tapes, no other means has been presented for Category IV class members to prove that their names and personal identification information were ever on an LSDB, or that they were ever subject to the aggregation of PII performed by Time Warner Cable Direct, the division responsible for the list sales business, mooting their notice claims as well.[28] These claims suffer from a significant risk that they would not prevail compared to those of the Category I, II, and III class members. A claim which cannot be proven is worth essentially nothing. Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and adequate. *See WorldCom*, 388 F.Supp.2d at 343.

The Loburs contend that the release of any claim, no matter how small, should be compensated. But the Second Circuit has noted that, to some degree, broad class definitions are a necessary evil, since, "[p]ractically speaking, 'class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'" *Wal–Mart Stores Inc. v. Visa U.S.A. Inc.*,

---

**28.** Having one's name on an LSDB does not necessarily indicate that the person's information

had been sold, since third parties purchased PII based upon sorting criteria, not the entire list.

396 F.3d 96, 106 (2d Cir.2005) (quoting *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 254 (2d Cir.2001), *aff'd in part by an equally divided court and vacated in part*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003)) (holding that plaintiffs in a class action may release other claims not raised in that litigation so long as they arise from an "identical factual predicate" and there was an "adequacy of representation" of the interests underlying those claims). The Court therefore finds that the value of the Proposed Settlement to the Category IV plaintiffs falls within the "range of reasonableness." *Newman*, 464 F.2d at 689.

That said, the fact that the parties arbitrarily disregarded the 1996 LSDBs adds an element of unfairness to the Proposed Settlement. During oral argument, the Court inquired as to the existence of other LSDBs from which plaintiffs could have been identified. In response to the Court's observation that the record suggested no other LSDBs existed, Defendants attorney stated:

> In the main. But ... they did discover a couple of tapes from 1996. It is still unclear whether those tapes could still be accessed. There was different formatting, different software ... and it was also considered that those lists would not yield as good a result as the most current list. So in the context of the settlement, the agreement was to use the list that was most current, and that the technical folk had confidence could be used for this purpose. (5–19–2006 Trans. 19:4–12).

Time Warner's attorney represented that those lists were potentially accessible but in his view, the results they would yield would not be as good at the 1999 LSDB, both of which influenced the parties to base their class count exclusively on the 1999 LSDB. There is no definitive indication that the 1996 LSDBs were unrecoverable, and there is no reason at all that the parties had to choose either the 1996 LSDBs or those from 1999. Without any rational basis for their decision to exclude a potential set of similarly situated claimants from the class, this distinction is neither fair, reasonable, nor adequate. Should the parties again seek settlement certification, any and all readable LSDBs must be used to identify the class.

### ii. Category III members

■ Objectors contend that the Category III members are treated unfairly by the Proposed Settlement because they receive a differential settlement benefit, despite holding precisely the same claims as those of Category I & II class members. All three categories are people whose names appear on the January 1999 LSDB. They share precisely the same risk that their information was sold. They are differentiated only by two characteristics—whether they are current or former subscribers, and whether they live in or outside an area currently serviced by Time Warner. These differences have absolutely nothing to do with the merits of their claims. There is absolutely no way to rationally distinguish between the *claims* of these three categories of plaintiffs. Indeed, the Plaintiffs and Defendants fail to offer any other difference between Category I, II & III claimants that would justify providing Category III claimants with only the mere right to transfer their benefit to someone else. Even if the right to transfer a benefit is a benefit, it is clearly less valuable than the benefit itself. The inference that they are distinguished only because of either the cost that Defendants would incur in compensating them or the value that Defendants would receive from providing them a benefit—or both—is unshakeable. A class settlement may not arbitrarily distinguish between similarly situated plaintiffs simply because it might cost more to compensate them than others. The parties urge the court to consider the injunctive relief as adequate compensation for Category III members. The injunctive and other relief, shared universally, does not affect the unjustified allocative differences between the first three categories of class members, compelling the court to deny final approval of the settlement. As the foregoing reasons overwhelmingly compel the Court to deny certification, the Court does not have occasion to reach the remainder of the arguments made at the Fairness Hearing, nor does it reach the validity of the attorneys' fees requested by plaintiffs' counsel.

## CONCLUSION

Although the Court is well aware of the expenses incurred by the parties in anticipation of settlement approval, that expectation cannot relieve the proponents of their obligation to show that the notice is proper and that the settlement is fair and that the class may be certified. *See In re Matzo Food Prods. Litig.*, 156 F.R.D. 600 (D.N.J.1994); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir.1979).

The realities of this litigation have not escaped this Court. The attorneys on both sides are under significant pressure to settle a case that poses tremendous manageability concerns. There are significant costs imposed on defendants in high-stakes complex class action litigation, particularly in the context of statutory damage award minimums that, in a worst-case scenario for defendants, threaten devastating judgments as punishment for largely technical violations of statutory notice provisions. It is not surprising that when facing such catastrophic damages awards a defendant would prefer to settle for a fraction of the damages to which they may be exposed. Additionally, the prospect of an in-kind settlement may also be enticing, as the defendant may provide a class benefit at a fraction of its retail price while also obtaining marketing benefits inherent in the provision of those services. But it is in large part because of these consideration that the Rule 23 mandates judicial approval of the settlement process.

It is equally apparent that plaintiffs facing significant legal obstacles such as those present here may be willing to settle for some fraction of their asserted claims.

Those incentives may be compounded by statutes such as 47 U.S.C. § 551(f)(2)(C), which awards attorneys' fees for prevailing plaintiffs. As this Court noted at the Fairness Hearing, such provisions for attorney compensation exist to encourage enforcement of the law by private parties, in effect deputizing individual litigants (and their lawyers) as private attorneys general. (Trans. May 19, 2006 83:23–25). Despite the commonality of interest between clients and their attorneys in such class actions, attorney and client interests are not perfectly aligned, particularly when attorneys do not work on a contingency fee. Individuals may lack either the will or the means to monitor class counsel's direction of the litigation because of the paltry individual share they may take from any possible award, while for the attorneys it may make little sense to bargain for only nominal increases in the benefits paid to each class member if doing so might risk a heavy fee. Moreover, in cases such as this one which have dragged on for years, the pressure on Plaintiffs' counsel to settle may be increased by the risks and costs of continued litigation, most of which as a practical matter the attorneys—and not the plaintiff—will bear. This is not to say that any of these issues were necessarily in play here, but that they lurk in the background of class actions, particularly enormous ones such as this, and provide the rationale for Rule 23's mandate that district court's ensure that settlement classes comply with its requirements.

Regardless of whatever settlement pressure was felt by the parties, the inference is inescapable that the Proposed Settlement was not primarily tailored to the risks of the litigated claims, but that it was limited to those individuals who either are or could potentially be customers of Time Warner. It is true that there is no per se prohibition on the defendant receiving a business benefit as a result of a settlement. However, it cannot be obtained by providing settlement awards only to certain class members while requiring a release from others who will obtain no benefit at all. Such a distinction is not based upon the merits of their claims, but instead upon the convenience and value to the defendant of compensating them. Indeed, to the extent that Category III plaintiffs who don't live in an area serviced by Time Warner, either because they have moved or Time Warner no longer services their area, cannot as a practical matter receive an in-kind benefit, it is not on account of their claims, but instead on account of the Proposed Settlements' terms. Even if these were the only terms upon which the defendants were willing to settle, they cannot pass muster under 23(e), since the claims of some class members cannot be sacrificed for the betterment of others. The standards for determining whether a class can be certified imply that if one plaintiff's claim merits a remedy, so do the claims of the class members she repre-

sents. Likewise, if her claim be meritless based upon characteristics she shares with the class as a whole, relief for all of them must be denied. This principle is no less applicable in the context of settlement. Therefore, the Court finds that the Proposed Settlement is unfair, unreasonable and inadequate.

Since the Proposed Settlement cannot not be certified as a 23(b)(2) class, and since the notice provided for has not been shown to be the "best notice practicable" as required for 23(b)(3) certification, and finally, since its terms do not provide the same compensation to similarly situated members, the Court must deny final approval.

This decision leaves several outstanding motions, including the Loburs' motions to intervene and for discovery in anticipation of the Fairness Hearing. Given the impact that today's decision has on this case, the Court holds in abeyance the remainder of the outstanding motions pending the exhaustion of the 10-day period in which the parties may appeal this determination provided the appeal is permitted by the Court of Appeals, pursuant to Fed.R.Civ.P. 23(f).

SO ORDERED.